# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Case No. 1:21-880

| | |
|---|---|
| LILLITH CAMPOS; C.B., by his parent and next friend, SHELLEY K. BUNTING; and M.D., by her parent and next friend, KATHERYN JENIFER, <br><br> *Plaintiffs*, <br><br> v. <br><br> MANDY COHEN, in her official capacity as Secretary of the North Carolina Department of Health and Human Services; MARK BENTON, in his official capacity as Assistant Secretary of Public Health; and CLARLYNDA WILLIAMS-DEVANE, in her official capacity as State Registrar and Director of the North Carolina State Center for Health Statistics, <br><br> *Defendants*. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Lillith Campos, C.B., a minor, by and through his parent and next friend, Shelley K. Bunting, and  M.D., a minor, by and through her parent and next friend, Katheryn Jenifer (collectively, "Plaintiffs")[1], by and through their attorneys, file this Complaint for Declaratory and Injunctive Relief against Defendants Mandy Cohen, in her official capacity as Secretary of the North Carolina Department of Health and Human Services, Mark Benton, in his official capacity as Assistant Secretary of Public Health, and

---

[1] Because they are minors, Plaintiffs C.B. and M.D. are proceeding under their initials pursuant to Federal Rule of Civil Procedure 5.2(a).  However, Plaintiffs C.B. and M.D. would nonetheless proceed under pseudonym were they of age in order to protect their privacy regarding their transgender status.

1

ClarLynda Williams-DeVane, in her official capacity as State Registrar and Director of the North Carolina State Center for Health Statistics (collectively, "Defendants"), and respectfully allege as follows:

## INTRODUCTION

1.      Plaintiffs are transgender persons born in North Carolina who wish to correct their respective North Carolina birth certificates to accurately reflect their sex, consistent with each one's gender identity.  They seek access to birth certificates that they can use without the unnecessary and potentially harmful disclosure of their transgender status and without being exposed to discrimination and other harms, including harassment and violence.

2.      Plaintiff Lillith Campos is a woman born in North Carolina, yet the North Carolina Department of Health and Human Services ("DHHS") incorrectly identifies her as male on her birth certificate.  Plaintiff C.B. is a young man born in North Carolina, yet the DHHS incorrectly identifies him as female on his birth certificate.  Plaintiff M.D. is a girl born in North Carolina, yet DHHS incorrectly identifies her as male on her birth certificate.

3.      Possessing accurate identification documents that are consistent with a person's gender identity—which represents a person's core internal sense of their own gender—is essential to one's basic social, economic, and mental well-being.  A birth certificate is a critical and ubiquitous identification document used in many settings to verify an individual's identity.  Access to employment, education, housing, health care,

2

banking, credit, travel, and several government services all hinge on having appropriate and accurate personal documentation that reflects a person's true identity. For children and adolescents, a birth certificate is often their only form of government-issued identification, as it is used for school enrollment, recreational sports registrations, and camp signups. Not only are birth certificates themselves commonly used for such purposes, but birth certificates are also often required to obtain other essential identification documents.

4.     For transgender persons, the sex designation on their original birth certificate is inaccurate because they were assigned the incorrect sex at birth. Correcting the sex designation on their birth certificate is critically important for transgender people. Indeed, few things are as essential to one's personhood and regular interaction with the world as being able to accurately present one's identity to the world.

5.     While the State of North Carolina provides non-transgender (i.e., cisgender) people born in North Carolina with accurate birth certificates—birth certificates that accurately reflect their sex, as determined by their gender identity—the State of North Carolina impermissibly burdens the right of transgender people born in North Carolina to obtain birth certificates that reflect their sex, consistent with their gender identity, by requiring proof of "sex reassignment surgery"[2] (hereinafter the "Surgical Requirement").

---

[2] By using the phrase "sex reassignment surgery" herein, Plaintiffs are quoting the text of N.C. Gen. Stat. § 130A-118(b)(4); however, Plaintiffs note that this phrase is outmoded and inaccurate. Instead, Plaintiffs use the phrases "gender-affirming medical care" or "gender-affirming surgery," when appropriate, as such terminology is widely accepted in the medical community.

3

6. Despite imposing the Surgical Requirement, the State of North Carolina does not further define in any law or regulation the phrase "sex reassignment surgery." Because the statute does not explicitly identify what forms of medical treatment constitute "sex reassignment surgery," a clerk reviewing a request to correct the sex designation on a birth certificate[3] has no statutory instruction as to whether a requestor's medical treatment satisfies the statute. With no direction from the statute, the decision is left to the subjective whims of each clerk. This results in arbitrary and discriminatory enforcement of the statute—rendering the statute unconstitutionally vague.

7. The burdens imposed by North Carolina's Surgical Requirement, which stand as a significant obstacle to transgender persons' ability to correct the sex designation on their birth certificates to accurately reflect their sex in a manner consistent with their gender identity, stands in sharp contrast to the approach taken by approximately 34 states that allow transgender persons to correct the sex designation on their birth certificates without a surgical requirement. Indeed, the Surgical Requirement is inconsistent with North Carolina's own policy of permitting transgender persons to correct the sex designation on their driver's licenses to match their gender identity without requiring any medical procedures.[4]

---

[3] The sex designation on a birth certificate or other forms of identification is also often times referred to as a gender marker.

[4] Notably, the driver's license policy does *not* require a transgender person to have undergone "sex reassignment surgery," but merely to provide a standardized form from a health professional affirming the person's gender identity.

4

8.     In practice, North Carolina's Surgical Requirement effectively deprives many transgender persons born in North Carolina of access to birth certificates they can use.  This policy bars transgender persons who, for whatever reason (whether financial, social, medical, or otherwise), are unable or unwilling to undergo "sex reassignment surgery" from correcting the sex designation on their birth certificates.  This policy subjects transgender persons to invasions of privacy, prejudice, discrimination, humiliation, harassment, stigma, and even violence, and establishes a barrier to transgender persons' full participation in society.  For transgender people who suffer from gender dysphoria, placing a substantial burden on the ability to correct the sex designation on their birth certificates can interfere with medical treatment and may increase their dysphoria and distress.

9.     North Carolina's Surgical Requirement, which each Defendant enforces, violates the United States Constitution's guarantees of equal protection of the laws, equal dignity, fundamental rights to privacy, liberty, autonomy, and freedom of speech and expression.  These constitutional guarantees protect personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity, such as a person's gender identity.

10.     No compelling, important, or even legitimate governmental justification supports North Carolina's refusal to provide transgender people who have not undergone "sex reassignment surgery" with accurate birth certificates that match their gender identity.

5

## JURISDICTION AND VENUE

11.     This action arises under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation of certain guarantees, under color of states' rights, secured by the United States Constitution.

12.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws and the Constitution of the United States.

13.     Venue is proper in the Middle District of North Carolina under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiffs' claims occurred, and will continue to occur, within the district.

14.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201 and 2202.

15.     This Court has personal jurisdiction over Defendants because they are domiciled in North Carolina and/or have otherwise made and established contacts with North Carolina sufficient to permit the exercise of personal jurisdiction over them.

## PARTIES

### A.     The Plaintiffs

*Plaintiff Lillith Campos*

16.     Plaintiff Lillith Campos is a 45-year-old woman who was born and currently resides in Jacksonville, North Carolina.  She is transgender.  Lillith Campos wishes to

6

correct her North Carolina birth certificate, which currently indicates her sex as male, to accurately reflect her sex as female, as determined by her gender identity. Her employer-sponsored health insurance plan does not provide coverage for "sex reassignment surgery," and she cannot independently afford the surgery.

**Plaintiff C.B.**

17.     Plaintiff C.B. is a 16-year-old young man who was born and currently resides in Chapel Hill, North Carolina. He is transgender. C.B. wishes to correct his North Carolina birth certificate, which currently indicates his sex as female, to accurately reflect his sex as male, as determined by his gender identity. Because C.B. is a minor, C.B. sues pursuant to Federal Rule of Civil Procedure 17(c) and Local Civil Rule 17.1(a) by and through his parent and next friend Ms. Shelley K. Bunting.

**Plaintiff M.D.**

18.     Plaintiff M.D. is a 14-year-old girl who was born in Fayetteville, North Carolina and currently resides in Carrboro, North Carolina. M.D. wishes to correct her North Carolina birth certificate, which currently indicates her sex as male, to accurately reflect her sex as female, as determined by her gender identity. Because M.D. is a minor, M.D. sues pursuant to Federal Rule of Civil Procedure 17(c) and Local Civil Rule 17.1(a) by and through her parent and next friend Ms. Katheryn Jenifer.

**B.     The Defendants**

19.     Defendant Dr. Mandy Cohen ("Secretary Cohen") is sued in her official capacity as Secretary of the North Carolina DHHS. Secretary Cohen supervises the

7

activities of the North Carolina DHHS and enforces North Carolina's vital records laws, including the Vital Statistics Act. For example, pursuant to N.C. Gen. Stat. § 130A-91, Secretary Cohen is empowered to appoint the State Registrar of Vital Statistics. Secretary Cohen has knowingly encouraged, condoned, and/or acquiesced in the acts barring Plaintiffs from living consistent with their gender identity, namely by enforcing the Surgical Requirement, which prevents Plaintiffs from correcting the sex designation on their birth certificates. Secretary Cohen is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

20. Defendant Mark Benton is sued in his official capacity as Assistant Secretary for Public Health within the North Carolina DHHS. Mr. Benton is responsible for supervising and managing the Public Health Division of the North Carolina DHHS, which encompasses the Vital Records Section. Mr. Benton has knowingly encouraged, condoned, and/or acquiesced in the acts barring Plaintiffs from living consistent with their gender identity, namely by enforcing the Surgical Requirement, which prevents Plaintiffs from correcting the sex designation on their birth certificates. Mr. Benton is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

21. Defendant ClarLynda Williams-DeVane, Ph.D. is sued in her official capacity as State Registrar and Director of the North Carolina State Center for Health Statistics. Pursuant to N.C. Gen. Stat. § 130A-92, as State Registrar, Dr. Williams-DeVane "shall secure and maintain all vital records" required by the North Carolina Vital Statistics

8

Act and to enforce the provisions of the North Carolina Vital Statistics Act. Dr. Williams-DeVane is therefore responsible for managing the North Carolina Vital Records Section, which collects, issues, maintains, and amends birth certificate records. Dr. Williams-DeVane has knowingly encouraged, condoned, and/or acquiesced in the acts barring Plaintiffs from living consistent with their gender identity, namely by enforcing the Surgical Requirement, which prevents Plaintiffs from correcting the sex designation on their birth certificates. Dr. Williams-DeVane is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

## STATEMENT OF FACTS

### A. Sex, Gender Identity, and Gender Dysphoria

22. A person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. These characteristics may not always be aligned.

23. The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth. Typically, a person is assigned a sex on their birth certificate solely based on the appearance of external genitalia at the time of birth. Other sex-related characteristics (such as a person's chromosomal makeup or gender identity, for example) are typically not assessed or considered at the time of birth.

24. External reproductive organs alone are not determinative of a person's sex, though, and can be in conflict with a person's own gender identity.

9

25. Instead, gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex. Every person has a gender identity, and that gender identity is *the* critical determinant of a person's sex, including for transgender people whose sex-related characteristics are not in typical alignment.

26. Gender identity and transgender status are thus inextricably linked to one's sex and are sex-related characteristics.

27. For the majority of people, their sex assigned at birth conforms with their gender identity. That is not the case, however, for transgender people.

28. Transgender persons are people whose gender identity diverges from the sex they were assigned at birth. A transgender man's sex is male (even though he was assigned the sex of female at birth) and a transgender woman's sex is female (even though she was assigned the sex of male at birth).

29. Cisgender persons are people whose sex assigned at birth aligns with their gender identity. A cisgender man's sex is male (and he was assigned the sex of male at birth) and a cisgender woman's sex is female (and she was assigned the sex of female at birth).

30. There is a medical consensus that gender identity is innate, has biological underpinnings (including sexual differentiation in the brain), and is fixed at an early age. As such, efforts to change a person's gender identity are unethical and harmful to a person's health, dignity, and well-being.

31.     Attempts to change a person's gender identity to bring it into alignment with the person's sex assigned at birth are not only unsuccessful but also dangerous, risking psychological and physical harm, including suicide.

32.     Likewise, the refusal to treat a person in a manner consistent with their gender identity is harmful to that person's dignity and well-being.

33.     Living in a manner consistent with one's gender identity is critical to the health and well-being of transgender people.

34.     The incongruence between a transgender person's gender identity and sex assigned at birth can sometimes be associated with gender dysphoria.  Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth.

35.     Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2013) ("DSM-5"), as well as by other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.  If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, suicidal ideation, and self-harm.

36.     Treatment of gender dysphoria is usually provided pursuant to the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, published by the World Professional Association of Transgender Health ("WPATH").

11

Medical treatment for gender dysphoria must be individualized and tailored to the medical needs of each patient.

37. Consistent with the WPATH Standards of Care, the Endocrine Society published clinical practice guidelines, titled the Endocrine Treatment of Gender Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, in September 2017. These guidelines reaffirm the WPATH Standards of Care and offer medical providers practical guidance on providing transition-related care to patients with gender dysphoria, including young people.

38. The process by which transgender people come to live in a manner consistent with their gender identity, rather than their sex assigned at birth, is known as transition.

39. The steps that transgender people take to transition, as well as to treat their gender dysphoria, vary with each individual's specific needs, but these steps generally include one or more of the following: (1) social transition; (2) hormone therapy; and/or (3) gender-affirming surgery.

40. Social transition entails a transgender person living in a manner consistent with the person's gender identity. For example, for a transgender man, social transition may include, among other things, changing his first name to a name typically associated with men; using male pronouns; changing his identity documents to indicate his male gender; wearing clothing and adopting grooming habits stereotypically associated with men; and otherwise living as a man in all aspects of life.

12

41.     Social transition requires that a transgender woman or a transgender man be recognized, respectively, as a woman or a man, and treated as such by family members, coworkers, and others in the community.

42.     Social transition is thus an important aspect of transition for a transgender person.  Social transition represents an important part of a transgender person's ability to appear and act in a manner consistent with their gender identity, regardless of their physical characteristics.

43.     Social transition is also part of necessary medical treatment for many transgender people with gender dysphoria.  While social transition can be adequate and appropriate treatment for gender dysphoria for some transgender people, others may require medical intervention as well.

44.     Medical transition, a critical part of transitioning for many transgender persons, includes treatments that bring the sex-specific characteristics of a transgender person's body into alignment with their gender identity, such as hormone replacement therapy or surgical care.  Whether other treatment is medically necessary or appropriate depends on a person's individualized needs and health.

45.     Hormone replacement therapy involves taking hormones for the purpose of bringing one's secondary sex characteristics into typical alignment with one's gender identity.  For young adolescents, puberty-delaying medication may be necessary to prevent their bodies from developing unwanted secondary-sex characteristics that conflict with their sex, as determined by their gender identity.

46.     Gender-affirming surgery is not medically necessary or desirable for all transgender people.  There are multiple kinds of gender-affirming surgeries, including but not limited to chest surgeries, genital surgeries, and others.  Thus, even for those transgender people who need gender-affirming surgery, the specific surgery that a transgender person needs varies based on the person's individual needs.  For example, surgery may be medically contraindicated, not recommended, or cost prohibitive.  Like any other health care decision, whether to undergo gender-affirming surgery is a profoundly personal decision, done in consultation with medical professionals.

47.     Under the prevailing standards of care, most types of gender-affirming surgery are not recommended for minors, except under limited circumstances.  The most common surgical procedure that is sometimes medically necessary for transgender young people is chest reconstruction surgery.  That procedure is specifically for transgender males.  However, because of the increasing availability of puberty-delaying medication, many transgender boys never need that surgery.

48.     A person's ability to access treatment—particularly gender-affirming surgery—may also be limited by financial resources, insurance coverage, provider availability, and other barriers to health care access.

49.     The various components associated with transition—social transition and gender-affirming medical care—do not change a person's sex, but instead bring a person's physical appearance and lived experience into better alignment with their sex, as determined by their gender identity.

50.     Living in a manner consistent with one's gender identity is thus critical to the health and well-being of transgender people, as well as a key aspect of treatment for those who suffer from gender dysphoria.

51.     Being able to possess identity documents consistent with one's gender identity is necessary for a person's optimal physical and mental health.

52.     There is no medical or scientific basis for refusing to acknowledge a transgender person's sex, as determined by their gender identity, based on whether that person has undergone surgery or any other medical treatment.   Indeed, WPATH specifically acknowledges that surgical procedures are not required for social gender recognition and therefore should not be a prerequisite for identity document or record changes.

53.     Depriving transgender people of birth certificates that match their gender identity harms their health and well-being.   Similarly, requiring transgender people to undergo "sex reassignment surgery"[5] in order to correct the sex designation on their birth certificate (even in cases where such medical intervention is not needed, affordable, or recommended) also harms the health and well-being of transgender persons.   This deprivation also interferes with the international standard of care for gender dysphoria by

---

[5] No North Carolina statute, including N.C. Gen. Stat. § 130A-118, defines the phrase "sex reassignment surgery."   Further, as noted previously, this phrase has no discernable definition in the medical profession, has been supplanted by the more accurate phrase "gender-affirming surgery," and there are various kinds of gender-affirming surgeries.

15

impeding a transgender person's ability to live in a manner consistent with their gender identity and can aggravate symptoms of gender dysphoria.

**B.      The Need for Accurate Birth Certificates Matching One's Gender Identity**

54.      A person's birth certificate is a trusted and essential government-issued document that serves as proof of a person's identity.  For this reason, the government makes a copy of a birth certificate available to the person reflected on the birth certificate, rather than merely reserving it for the government's own use.

55.      The birth certificate also reflects the government's recognition of a person's identity, including the person's sex, just as a marriage certificate reflects government recognition of a person's relationship.

56.      The use of birth certificates to demonstrate identity is ubiquitous in our society.  Birth certificates are commonly used in a wide variety of contexts and are one of the primary ways of proving age and citizenship.  In the ordinary course of life, a birth certificate is often required directly by employers and educational institutions for enrollment, or at a minimum, is required as a prerequisite to securing other important identification documents (such as driver licenses, state identification cards, social security cards, passports, and other state and federal identification documents).

57.      Birth certificates are also commonly used in determining eligibility for enrolling in government programs, establishing school records, and proving age.  For example, North Carolina regulation requires that applicants for admission to the state bar as a licensed attorney submit their birth certificate as part of their application.  NC Board

of Law Examiners, Rules Governing Admission, Rule .0402(1). In addition, for trust accounts established for the benefit of a minor, North Carolina statute requires the beneficiary to present a birth certificate in order to access the trust upon turning 18 years of age. N.C. Gen. Stat. Ann. § 48A-16(b).

58. Because of these and other instances in which a birth certificate serves as proof of identity or citizenship, every person needs a birth certificate that accurately reflects their identity. However, transgender people born in North Carolina, unlike cisgender people born in North Carolina, face a significant burden in obtaining an accurate birth certificate, a burden which is insurmountable for some, and unnecessary for others.

59. The sex designation originally placed on a transgender person's birth certificate is inaccurate because it is based on visual assumptions about that person's sex made at the time of their birth, without taking into consideration any other relevant factors that determine a person's sex, including, most importantly, gender identity, but also including chromosomal characteristics or internal components.

60. Depriving transgender persons of birth certificates that accurately reflect their sex, consistent with their gender identity, forcibly discloses private and sensitive information about them in contexts where it would otherwise remain undisclosed (such as when seeking employment or when voting), regardless of whether a person's transgender status may otherwise be known by others (for example, by friends or family), and regardless of a person's desire not to disclose that personal information.

17

61.     Transgender persons denied an accurate birth certificate are thus deprived of significant control over the circumstances surrounding disclosure of their transgender status, including when, where, how, and to whom their transgender status is disclosed.

62.     Being compelled to present a birth certificate that inaccurately reflects a transgender person's sex can often subject that person to serious invasions of privacy.  A person's transgender status (and medical diagnosis of gender dysphoria) constitutes deeply personal and sensitive information over which a transgender person has a reasonable expectation of privacy, and the disclosure of which can jeopardize a person's safety and risk bodily harm.

63.     An inaccurate birth certificate thus subjects transgender people to invasions of privacy, prejudice, discrimination, humiliation, harassment, stigma, and even violence.

64.     Indeed, as a result of being forced to use identification documents that are inconsistent with who they are, transgender persons experience high rates of discrimination (including being denied service or asked to leave public accommodations, workplaces, or housing), harassment, and violence.  A national survey conducted by the National Center for Transgender Equality in 2015 revealed that nearly one third of respondents who had shown an identification document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.

65.     More generally, not having accurate identity documents can be a barrier to full and safe engagement in society for transgender people, who, because they are unable to obtain accurate birth certificates, often forego opportunities and protections that non-

18

transgender people holding accurate identification documents currently enjoy in North Carolina. Transgender people experience substantial discrimination and harassment in a wide variety of contexts, including with respect to employment, education, public accommodations, health care, housing, and interactions with the government, including law enforcement. Transgender persons are also disproportionately targeted for hate crimes. These realities make the involuntary disclosure of a person's transgender status particularly harmful and dangerous.

66. Furthermore, denying transgender persons accurate birth certificates, consistent with their gender identity, undermines rather than serves the purpose of verifying that a transgender person is, in fact, the same person reflected on that person's birth certificate. For example, a transgender man who has taken steps to bring his body and lived experience into alignment with his gender identity, will correctly be perceived as male by others. Forcing that man to use a birth certificate that inaccurately states he is female will cause others to question whether he is the same person reflected on the birth certificate, exposing him to potential invasions of privacy, prejudice, discrimination, humiliation, harassment, stigma, and even violence.

67. The State of North Carolina's refusal to provide transgender persons with a birth certificate that matches their gender identity absent proof of "sex reassignment surgery" constitutes a stigmatizing refusal to acknowledge their sex, which is particularly harmful given that a birth certificate is the quintessential identity document. This refusal deprives Plaintiffs of their equal dignity.

**C.** **North Carolina's Birth Certificate Policies and Surgical Requirement**

68.     The North Carolina DHHS, which includes the North Carolina Division of Public Health and the Vital Records Section, exercises responsibility for the registration, issuance, correction, and change of North Carolina birth certificates.

69.     Secretary Cohen oversees the North Carolina DHHS, which includes the Division of Public Health and the Vital Records Section.

70.     North Carolina birth certificates include, *inter alia*, the given name and surnames of the newborn child, the date of birth, the names of a child's parents (if available), and the purported sex of the child.

71.     Upon information and belief, it is the practice of the State of North Carolina, for purposes of determining the sex designation on birth certificates, to rely solely on observations about the genitalia of newborns.

72.     Recognizing that the information in a birth certificate may sometimes be inaccurate or need updating, the Vital Statistics Act and the regulations promulgated and enforced by Defendants permit the correction of errors and updates to certain information in birth certificate records.

73.     For example, N.C. Gen. Stat. § 130A-118(b)(1) allows for a new birth certificate to be issued (with updated information) when proof is submitted that previously unwed parents of a person have intermarried subsequent to the birth of the person.   In addition, N.C. Gen. Stat. § 130A-118(b)(2-3) allows for a new birth certificate to be issued (with updated information) when a court of competent jurisdiction enters "a judgment,

20

order or decree disclosing different or additional information relating to the parentage of a person."

74. Similarly, pursuant to N.C. Gen. Stat. § 130A-118(c), a new birth certificate may be updated to reflect a change in surname when a child is legitimated by subsequent marriage and the parents agree to request that the child's surname be changed.

75. Further, pursuant to N.C. Gen. Stat. § 48-9-107(a), a new birth certificate shall be issued, with appropriate updates, upon the receipt of a report of the adoption of a child, seemingly without any input from the (adoptive) parents or child needed.

76. The implementing regulations under the Vital Statistics Act also specify the typically broad authority of Defendants to issue corrections for a birth certificate. For example, 10A NCAC 41H .0902 denotes various forms of minor errors, such as a clerical error, misspelling of a child's name within four years of the child's birth, or addresses, that may be corrected with a notarized written application. Similarly, 10A NCAC 41H .0903, delineates other items, such as the sex of the child, date of birth, or spelling of the child's name after four years of birth, that may be corrected with a notarized application and an additional piece of documentary evidence. For these corrections, with the notable exception of the sex of the child, any subsequent certificates shall be marked as "amended."

77. However, North Carolina's Vital Statistics Act prohibits changes to the sex on individual birth records unless such change is requested "because of sex reassignment surgery" and further requires that any such request be "accompanied by a notarized statement from the physician who performed the sex reassignment surgery or from a

physician licensed to practice medicine who has examined the individual and can certify that the person has undergone sex reassignment surgery." N.C. Gen. Stat. § 130A-118(b)(4). Based on this provision, Defendants enforce a policy, custom, or practice that substantially burdens and, in many circumstances, effectively prohibits transgender persons born in North Carolina from correcting the sex listed on their birth certificates so that it matches their sex, consistent with their gender identity, regardless of what other steps such persons have taken to live in a manner consistent with their gender identity. This is North Carolina's Surgical Requirement challenged herein.

78.    So, while Defendants have promulgated rules and regulations permitting certain persons born in North Carolina the ability to correct the sex listed on a person's birth certificate in order to accurately identify the sex of such person, Defendants impose a substantial burden on transgender persons born in North Carolina from correcting the sex listed on their birth certificates in a manner consistent with their gender identity.

79.    As such, North Carolina's Surgical Requirement stands in sharp contrast to the approach taken by the majority of states, the District of Columbia, and Puerto Rico, all of which permit transgender people to correct the sex designation on their birth certificate to accurately reflect their sex, consistent with their gender identity, without the need for any surgery. Indeed, the majority of states does not require that transgender persons undergo any particular medical procedures, such as surgery, as a prerequisite to correcting the sex designation on their birth certificates.

80.    Similarly, the U.S. Department of State permits corrections to the gender marker on a person's passport without any requirement that the person undergo surgery. Other federal agencies, including the Social Security Administration, have similar standards for changing a person's gender marker in agency records.

81.    North Carolina's Surgical Requirement also stands in contrast to North Carolina's own policy permitting transgender persons to correct the sex designation on their driver's licenses and state identification cards to accurately reflect their sex, consistent with their gender identity, without any requirement that they undergo surgical procedures. The North Carolina Department of Motor Vehicles ("DMV") allows transgender persons to correct the sex designation on their driver's licenses so that the licenses accurately reflect their sex.  Like the federal government, the DMV does not require transgender persons to have undergone any particular medical procedure (e.g., gender-affirming medical care or "sex reassignment surgery") in order to do so.  The DMV only requires that the person requesting the sex designation correction provide any one of the following: (1) a sex designation form signed by a health professional (including a physician, psychiatrist, therapist, or a social worker) acknowledging the person's gender identity; (2) a passport (or birth certificate) reflecting the individual's requested sex designation; or (3) a court order recognizing the individual's requested sex designation.[6]

---

[6] A copy of the North Carolina Division of Motor Vehicles Sex Designation Form is available at https://www.ncdot.gov/dmv/downloads/Documents/DL-300.pdf.

82.     Furthermore, a requirement that transgender persons undergo "sex reassignment surgery" in order to correct the sex designation on their birth certificates is inconsistent with the positions of mainstream medical organizations (such as the American Medical Association), which support the correction of the sex designation on transgender people's identity documents and oppose any requirement of specific medical care, including surgeries, in order for transgender persons to make such corrections.

83.     North Carolina's Surgical Requirement is not supported by any compelling, important, or even legitimate government interest.

84.     The Surgical Requirement lacks any necessary, narrowly tailored, substantial, or even rational relationship to any valid government interest.

**D.     Plaintiff Lillith Campos**

85.     Plaintiff Lillith Campos is employed at the Holly Ridge, North Carolina branch of a snack food company.  Her employer provides a self-funded healthcare plan for its employees, including Ms. Campos.  The plan includes a categorical exclusion for transgender health coverage and has thus far excluded health coverage related to Ms. Campos's transgender status and transition, including gender-affirming surgery.

86.     Ms. Campos is transgender.  She was assigned the sex of male at birth, and her North Carolina birth certificate identifies her as a male.  However, she is female.  Ms. Campos's identity as a woman is just as deep-seated as that of women who were assigned female at birth.

24

87.     Ms. Campos began questioning her assigned sex around the age of four. During her childhood, she knew that she was different from other children, but was not aware that other transgender people existed.  By the time she was 14 years old, she was aware of her female gender identity, but was fearful of telling her family and friends, and thus did not openly express her female gender identity.  She nonetheless began expressing her female gender identity in private, including by wearing feminine clothes.  When this was discovered by her parents, they sent her to a psychiatrist who asked her if she was a "transvestite."  Fearful of the repercussions, including that her parents might disown or otherwise severely punish her, Ms. Campos answered the psychiatrist's question in the negative, denying she was transgender.  In response, the psychiatrist assured her that this was "good," because expressing a female gender identity, according to the psychiatrist, was "not normal behavior."

88.     For several years, Ms. Campos struggled emotionally with her own gender identity.   Then, in or around 2017, Ms. Campos met with a gender therapist, who helped her explore and better understand her gender identity.

89.     Even after Ms. Campos accepted herself as a woman, she faced challenges openly expressing her female gender identity.  Her partner at the time discouraged her from coming out publicly.  Ms. Campos was fearful that she would face ridicule, harassment, and possibly even violence if she were to openly express her gender identity.  She was also afraid that she would lose her job, and that her children would face harassment or abuse.

At that time, there were no resources for transgender people in Jacksonville, where Ms. Campos resides.

90.     Ms. Campos began hormone replacement therapy in 2018, completed her social transition around June 2019, and Campos legally changed her name from the typically male name she was given at birth to her current typically female name in July 2019.  Since beginning hormone replacement therapy, she has noted positive changes in her life.  According to her, the fog in her head has been lifted.  Because Ms. Campos's health insurance does not cover gender-affirming healthcare, including surgery, Ms. Campos is unable to afford gender-affirming surgery on her own, particularly when she is the primary provider for three minor children.

91.     Within the last year, Ms. Campos has become increasingly involved in serving the lesbian, gay bisexual, transgender, and queer ("LGBTQ") community in Jacksonville and the surrounding areas.  Every Monday, she meets with a community support group at the Onslow County LGBT+ Community Center, for which Ms. Campos also serves as Vice Chair.  Within the group, Ms. Campos is a "safe zone" trainer: she educates others on how to provide a welcoming environment for LGBTQ persons.  To date, she has trained approximately eighty social workers employed at a variety of organizations throughout the city, including the health department, a local homeless shelter, and a women's center.

92.     Ms. Campos has four children, three of whom are minors and all of whom are accepting of her gender identity.

93.     Ms. Campos has since corrected the name and gender marker on all her identity documents to be consistent with her female identity, except for the sex designation on her birth certificate.  This includes, *inter alia*, her North Carolina driver's license, health insurance card, and social security card.

94.     Ms. Campos also wants to correct the sex designation on her birth certificate. However, due to North Carolina's Surgical Requirement, Ms. Campos has not been able to do so.  Because of the Surgical Requirement, Ms. Campos is prohibited from correcting the sex designation on her birth certificate because she lacks proof of "sex reassignment surgery."

95.     As a result of the Surgical Requirement, the sex designation on Ms. Campos's birth certificate still incorrectly identifies her as a male, which is inconsistent with her female gender identity and her other identification documents.

96.     Ms. Campos reasonably fears that possessing a birth certificate that fails to reflect her female gender identity increases the likelihood that she will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence.

97.     Ms. Campos has experienced frequent discrimination and verbal harassment related to her gender identity.  For instance, she would prefer to use the women's bathroom at work, but she is required to use a separate bathroom located in another part of the building.  In public, she has been the target of transphobic slurs.  Given this environment and to protect against invasions of privacy, prejudice, discrimination, distress, harassment

27

and violence, Ms. Campos wishes to have control over the disclosure of information regarding her gender identity.

98.     Ms. Campos is personally aware of the high incidence of violence and harassment directed at transgender persons, as well as the high rates of employment and housing discrimination faced by transgender people in North Carolina.

99.     Ms. Campos is stigmatized and harmed by North Carolina's Surgical Requirement.

100.    Defendants' refusal to issue a birth certificate accurately reflecting that Ms. Campos is female is a persistent and stigmatizing reminder that the State of North Carolina does not recognize her as a woman.   That refusal impedes her ability to function successfully as a woman in all aspects of her life, including any time she presents her birth certificate to others.

101.    Ms. Campos also objects to the State's message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

102.    Ms. Campos is harmed by North Carolina's Surgical Requirement, which interferes with her ability to obtain identity documents that are congruent with her gender identity.

103.    Being denied a birth certificate that accurately reflects her sex, consistent with her gender identity is psychologically and emotionally harmful to Ms. Campos, who

is faced with a persistent reminder that the State of North Carolina does not acknowledge her gender identity or recognize this core component of her personhood.

E.    **Plaintiff C.B.**

104.    Plaintiff C.B. is a high school student who enjoys swimming, video games, cars, and hanging out with friends.  In school, he particularly enjoys studying psychology and is considering it as a possible career path.

105.    Ever since he was a young child, C.B. rejected stereotypically female clothing, and would commonly dress in a more masculine manner.  For example, around when he was six years old, C.B. began to refuse wearing stereotypical female swimming suits, opting instead for board shorts and a shirt.  In late 2016, at age 11, he began to wear a short, typically masculine haircut.

106.    Though C.B. has always been very social and personable, getting along with most people and forming many friendships, he exhibited high levels of anxiety, including nausea so severe it prevented him from attending school on several occasions.  His parents later came to understand C.B.'s anxiety was associated with his untreated gender dysphoria.

107.    In early 2017, C.B. came out to his parents and informed them that he is transgender.  Soon after, in the spring of 2017, C.B. and his parents met with a therapist who noted he was experiencing symptoms of gender dysphoria.  After consultation with his family and therapist, C.B. asked to be placed on treatment to delay puberty.

108.     During the summer of 2017, C.B. socially transitioned by informing friends and family of his male gender identity, wearing more traditionally masculine clothes, started going by his current more typically masculine name, and living openly as the boy he is.  However, when his chest began to develop, C.B. began to experience additional anxiety.

109.     As a result of the distress associated with his birth assigned sex, C.B. was diagnosed with gender dysphoria.  Around August 2017, C.B. began receiving care from medical and mental health professionals and was later prescribed puberty-delaying treatment in the form of an implant as part of his treatment for gender dysphoria, which he started in September 2017.

110.     Once C.B. socially transitioned and began treatment, C.B.'s parents noticed that the anxiety he had been experiencing gradually diminished and that he was becoming a happier, more outgoing, and personable teenage boy.

111.     C.B. is known and treated as a boy at school and in all other aspects of his life.  He legally changed his name to his current more typically masculine name in the spring of 2018.

112.     Under his current health insurance, which is provided through C.B.'s father who is an enrollee in the North Carolina State Health Plan for Teachers and State Employees ("NCSHP"), gender-affirming care is excluded.  Therefore, C.B.'s family was forced to purchase supplemental health insurance in order to cover C.B.'s puberty-delaying medication in 2019.

113.     In early 2019, C.B. began obtaining puberty-delaying treatment via injection, rather than a long-lasting implant, because this was the only puberty-delaying treatment on the formulary of the additional health insurance his family purchased to supplement his coverage under the NCSHP.  In March 2019, C.B. began taking testosterone as hormone therapy for his gender dysphoria.

114.     In March 2020, C.B. obtained a driver's learner permit accurately reflecting his name and sex designation as male.  He later obtained a provisional license in March 2021 and a full license in September 2021, both of which also accurately reflect his name and sex designation as male.

115.     In addition to his driver's license, C.B. also possesses a U.S. passport with an accurate name and sex designation.  As soon as C.B. secured his legal name change in the spring of 2018, his mother, Ms. Bunting, immediately sought to secure a U.S. passport for C.B. with his accurate name and sex designation.  She did so not for the purpose of international travel, but specifically to avoid complications that would inevitably arise if C.B. were forced to rely on his inaccurate birth certificate as identification.

116.     Despite Ms. Bunting's efforts, C.B. cannot escape the specter of his incorrect birth certificate.  Specifically, school records and school computer systems, such as the statewide PowerSchool system, are required to reflect the inaccurate sex designation on a student's birth certificate.  The ability to correct the sex designation in the PowerSchool system, based on C.B.'s birth certificate, has been a cause of anxiety and distress for C.B. and his parents, as such records follow C.B. throughout his academic career.  For example,

the correction was especially important to C.B. because he had played lacrosse in middle school and was anxious about whether his new high school would ban him from boys' sports because of the inaccurate sex designation on his birth certificate and in PowerSchool.

117.     Upon information and belief, schools maintain on file a copy of a student's birth certificate.  As a result, anyone can discover C.B.'s transgender status by accessing his school file, which will follow C.B. throughout his education.

118.     C.B. does not currently have plans to undergo gender-affirming surgery, and as previously noted, most types of gender-affirming surgery are not recommended for minors under the prevailing standards of care.  In any event, he (and his parents) cannot afford such surgery at this time. C.B.'s insurance coverage is provided through the NCSHP, where he is enrolled as a dependent of his father, a retiree from the University of North Carolina, and which at present categorically excludes coverage for gender-affirming health care.[7]

119.     North Carolina's Surgical Requirement results in the sex designation on C.B.'s birth certificate incorrectly identifying him as female, which is inconsistent not only with his gender identity, but also his other identification documents.

120.     As C.B. has grown up, he has become more aware of the stress and hardships his parents went through to ensure he was able to live a normal life.  While his parents' efforts were able to shield him from much of the discrimination he faced as a young child,

---

[7] The categorical exclusion contained within the NCSHP is presently being challenged in *Kadel v. Folwell*, No. 1:19-CV-00272-LCB-LPA, which is pending before this Court.

as he has grown older, that discrimination has become more apparent to him. North Carolina's failure to acknowledge his gender identity, through its refusal to correct the sex designation on his birth certificate, is particularly hurtful. Unlike others in C.B.'s life who he can choose to avoid if they refuse to acknowledge his gender identity, C.B. cannot simply ignore the State of North Carolina or his inaccurate birth certificate, which will follow him all through life.

121.    C.B. reasonably fears that possessing a birth certificate that fails to reflect his male gender identity increases the likelihood that he will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence.

122.    C.B. is personally aware of the hostility, discrimination, and harassment that transgender people often experience when presenting identification that conflicts with their lived gender, as well as the high incidence of violence and harassment directed at transgender persons writ large.

123.    C.B. reasonably fears that possessing a birth certificate that is inconsistent with his gender identity increases the chances that he will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence, and he has taken steps to try to reduce those risks.

124.    C.B. is stigmatized and harmed by North Carolina's Surgical Requirement.

125.    As a result of North Carolina's Surgical Requirement, C.B.'s current birth certificate reflects the sex he was incorrectly assigned at birth, erroneously stating that he

is female and forcing him to use an identity document that inaccurately portrays his identity.

126. Defendants' refusal to issue a birth certificate accurately reflecting that C.B. is male is a persistent and stigmatizing reminder that the State of North Carolina does not recognize him as male. That refusal impedes his ability to function successfully as male in all aspects of his life, including any time he presents his birth certificate to others.

127. C.B. also objects to the state's message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

128. C.B. is harmed by North Carolina's Surgical Requirement, which interferes with his ability to obtain identity documents that are congruent with his gender identity.

129. Being denied a birth certificate that accurately reflects his sex, consistent with his gender identity is psychologically and emotionally harmful to C.B., who is faced with a persistent reminder that the State of North Carolina does not acknowledge his gender identity or recognize his core personhood.

**F.** <u>**Plaintiff M.D.**</u>

130. Plaintiff M.D. knew she was a girl from an early age. When she was just a toddler, she was enamored with her Sunday school teacher's high-heeled shoes, which she repeatedly asked to try on. She would wear her older sister's princess costumes, and most of her friends were other girls. She would vehemently resist leaving the house dressed as

a boy. At the age of four, M.D. verbalized how she felt and told her parents that she was supposed to be a girl.

131. M.D. and her parents began working with a therapist to better understand her identity.

132. At the age of six, M.D. socially transitioned. Her mother, Katheryn Jenifer, did her best to shield M.D. from as much discrimination as possible. M.D. nonetheless has experienced discrimination because she is transgender.

133. For example, at the age of eight, M.D.'s mom was informed that M.D. could not participate in her town's Parks & Recreation girls softball league because her gender identity did not match her sex designated at birth, as documented on M.D.'s birth certificate, which Ms. Jenifer was required by the league to provide. And though Ms. Jenifer and M.D. defied the league and M.D. participated in some games against their wishes, such discrimination has nonetheless left a lasting impact on her.

134. Even before the incident with her softball league, M.D. faced discrimination from a very young age. M.D. began tumbling as a toddler when Ms. Jenifer enrolled the two of them in a "Mommy and Me" class. When M.D. reached the age of about six and was due to advance to the next skill level, the gym refused to allow M.D. to participate in the girls' tumbling classes because she is transgender. Ms. Jenifer was forced to enroll M.D. in another tumbling gym that would allow her to participate in girls' tumbling classes, but this alternate gym was much farther away—nowhere near M.D.'s home or school— and did not include any of M.D.'s friends, who all used the much closer, local gym.

35

135.   M.D. also experienced discrimination at her elementary school. For example, the school prohibited M.D. from using the girls' restroom, and instead singled her out by forcing her to use a private separate restroom. When parents of other students learned that M.D. was a transgender girl, they raised questions about M.D.'s restroom access and complained to school administrators..

136.   Partially because of the discrimination and harassment faced by M.D., she and her family relocated to Carrboro, North Carolina in 2018, where her mother begun attending law school in order to better protect M.D.'s rights.   M.D.'s quality of life improved with the move, but the discrimination and harassment did not cease entirely.

137.   This year, M.D. entered high school.   M.D. is concerned that she will be unable to participate in sports in high school because she is transgender.   Although M.D. enjoys the social aspects of sports and hopes to join her school's diving team, she is considering forgoing sports altogether in order to avoid the stress and embarrassment of being told she cannot participate—a reasonable fear given the history of discrimination M.D. has faced.

138.   As is true for any transgender person, M.D. wishes to choose for herself when and to whom she discloses her transgender identity.   However, because of her inaccurate birth certificate, M.D. has experienced unwanted disclosure of her transgender identity by others.   For example, in the seventh grade, one of M.D.'s teachers informed the cheerleading coaches that she is transgender, which ultimately led to M.D. being singled-out from the other girls on her team.   As a result, and due to the social ostracism she has

36

experienced, M.D. has begun limiting the number of people to whom she discloses her transgender identity.

139.    M.D. has also faced challenges directly attributable to her birth certificate listing an incorrect gender identity.  For example, in order to enroll in her new school after the family moved to Carrboro, M.D. was required to present either a birth certificate or a U.S. passport.  In order to avoid complications that would inevitably arise by having an incorrect sex designation on her birth certificate, she had to obtain, at her family's expense, a U.S. passport with the correct sex designation.

140.    Even when presenting the passport with her correct gender, M.D. still faced difficulties because her birth certificate continues to list her incorrect sex.  For example, in school districts where M.D. previously lived, she was unable to update some of her school records because it is school policy to rely on an individual's birth certificate to determine a student's sex in those records.  Even when presented with a passport, certain schools refused to update M.D.'s records appropriately, because the sex designation on her passport conflicts with that listed on her birth certificate.

141.    Beyond an inability to update all her school records, M.D.'s incorrect birth certificate also causes her to be "outed" to any school official who must look up those files. M.D. has previously been outed in this way and expects to be so outed again in the future, as each time a school nurse must look up her information, for example, her transgender status is revealed, against her wishes and without her consent.

142.    In addition to socially transitioning, M.D. has begun some medical procedures to aid in her gender affirmation.  In the fall of 2019, M.D. began taking puberty-delaying medication as treatment for her gender dysphoria, and near the end of 2020, she began taking hormones via transdermal patches.

143.    M.D. does not currently have plans to undergo gender-affirming surgery, and as previously noted, most types of gender-affirming surgery are not recommended for minors under the prevailing standards of care.  In any event, she (and her parents) cannot afford such surgery at this time.  M.D.'s insurance coverage is provided by her father's job as a nurse at the University of North Carolina, and at present the NCSHP categorically excludes coverage for gender-affirming health care.

144.    North Carolina's Surgical Requirement therefore results in the sex designation on M.D.'s birth certificate incorrectly identifying her as male, which is inconsistent not only with her female gender identity, but also her other identification documents.

145.    M.D. reasonably fears that possessing a birth certificate that fails to reflect her female gender identity increases the likelihood that she will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence.

146.    As discussed above, M.D. has experienced first-hand the hostility, discrimination, and harassment that transgender people often experience when presenting identification documents that conflict with their lived gender.

147.   M.D. is personally aware of the high incidence of violence and harassment directed at transgender persons as well as the high rates of employment and housing discrimination faced by transgender people.

148.   M.D. is stigmatized and harmed by North Carolina's Surgical Requirement.

149.   As a result of North Carolina's Surgical Requirement, M.D.'s current birth certificate reflects the sex she was incorrectly assigned at birth, erroneously stating that she is male and forcing her to use an identity document that inaccurately portrays her identity.

150.   Defendants' refusal to issue a birth certificate accurately reflecting that M.D. is female is a persistent and stigmatizing reminder that the State of North Carolina does not recognize her as female.  That refusal impedes her ability to function successfully as female in all aspects of her life, including any time she presents her birth certificate to others.

151.   M.D. also objects to the state's message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

152.   M.D. is harmed by North Carolina's Surgical Requirement, which interferes with her ability to obtain identity documents that are congruent with her gender identity.

153.   Being denied a birth certificate that accurately reflects her sex, consistent with her gender identity is psychologically and emotionally harmful to M.D., who is faced with a persistent reminder that the State of North Carolina does not acknowledge her gender identity or recognize her core personhood.

## CLAIMS FOR RELIEF

## COUNT I – DEPRIVATION OF EQUAL PROTECTION
## IN VIOLATION OF THE FOURTEENTH AMENDMENT
## OF THE UNITED STATES CONSTITUTION

154. Plaintiffs hereby incorporate by reference and reallege all of the preceding paragraphs of this Complaint as though fully set forth herein.

155. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

156. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex as well as discrimination based on transgender status is presumptively unconstitutional and subject to heightened scrutiny.

157. Discrimination based on sex includes, but is not limited to, discrimination based on gender, gender identity, transgender status, gender transition, and nonconformity with sex stereotypes.

158. North Carolina's Surgical Requirement facially and intentionally discriminates against transgender people based on sex. When the government lists a person's sex on their birth certificate, the government literally creates a classification based on sex. In the case of transgender individuals, like Plaintiffs, this classification reflects a sex contrary to their sex, as determined by their gender identity, causing harm as a result.

159. Discrimination because a person is transgender constitutes (a) discrimination based on a sex, which requires courts to apply, at minimum, intermediate scrutiny when

40

evaluating the constitutionality of the government's discrimination, and (b) discrimination based on transgender status, which requires courts to apply heightened scrutiny to such discrimination.

160. Government discrimination against transgender people because of their transgender status bears indicia of a suspect classification requiring heightened scrutiny by the courts:

    a.  Transgender people have suffered a long history of extreme discrimination and continue to suffer such discrimination to this day;

    b.  Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination, and have been and continue to be regularly targeted for discrimination by legislation, regulations, and other government action;

    c.  A person's gender identity or transgender status bears no relation to a person's ability to contribute to society; and

    d.  Gender identity is a core, defining trait that is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment. Gender identity is also generally fixed at an early age and highly resistant to change.

161.     North Carolina's Surgical Requirement treats transgender persons differently than cisgender persons who are similarly situated.

162.     The Surgical Requirement facially and intentionally discriminates based on sex and transgender status by requiring that transgender people—and only transgender people—born in North Carolina submit proof of "sex reassignment surgery" in order to obtain birth certificates that accurately reflect their sex and that are consistent with their gender identity.  Cisgender people are not deprived of birth certificates that accurately reflect their sex and that are consistent with their gender identity.

163.     The Surgical Requirement facially and intentionally discriminates on the basis of sex and transgender status by depriving transgender people—and only transgender people—born in North Carolina who have not undergone "sex reassignment surgery" of access to an accurate birth certificate that they can use without sacrificing their privacy, health, safety, dignity, and autonomy.  Cisgender people born in North Carolina are not deprived of birth certificates that they can use without sacrificing their privacy, health, safety, dignity, and autonomy.

164.     The Surgical Requirement deprives transgender people born in North Carolina, including Plaintiffs, of their right to equal dignity and stigmatizes them as second-class citizens in violation of the Equal Protection Clause.

165.     The Surgical Requirement, thus, deprives transgender people born in North Carolina who have not undergone "sex reassignment surgery," including Plaintiffs, of their

equality and dignity by stigmatizing them and branding them as second-class citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment.

166. Furthermore, the Surgical Requirement also violates the Equal Protection Clause of the Fourteenth Amendment by unlawfully discriminating between different groups of transgender people: those for whom a gender-affirming surgery is possible or medically appropriate and those for whom it is not. Not all transgender people undergo "sex reassignment surgery." For some, the surgery is not medically necessary or even safe. Many do not have health insurance coverage and cannot afford to pay out-of-pocket. And for those who do receive surgical treatment, the degree or extent of this treatment varies from person to person based on their individual needs.

167. The Surgical Requirement deprives transgender people born in North Carolina, including Plaintiffs, of the ability to secure certain benefits to which they would otherwise be entitled.

168. The Surgical Requirement is not narrowly tailored to further a compelling government interest, substantially related to an important government interest, or even rationally related to a legitimate government interest.

169. Accordingly, Defendants are liable for their violations of the Fourteenth Amendment rights of Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring North Carolina's Surgical Requirement unconstitutional and enjoining its enforcement.

## COUNT II – DEPRIVATION OF DUE PROCESS
## IN VIOLATION OF THE FOURTEENTH AMENDMENT
## OF THE UNITED STATES CONSTITUTION

170.     Plaintiffs hereby incorporate by reference and reallege paragraphs 1 thru 153 of this Complaint as though fully set forth herein.

171.     The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. 198.

172.     The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

*Informational Privacy*

173.     The substantive protections of the Due Process Clause, as well as other constitutional provisions, give rise to a right to privacy, protecting information that is highly personal and intimate, which includes information that could lead to bodily harm upon disclosure.  Government infringement of these protections requires courts to apply strict scrutiny to such government action.

174.     Forced disclosure of a person's transgender status violates that person's fundamental right to privacy.  The fact that a person is transgender constitutes highly personal and intimate information.   A reasonable person would find the involuntary disclosure of one's transgender status to be deeply intrusive.

44

175.   The involuntary disclosure of one's transgender status can also cause significant harm, including placing one's personal safety and bodily integrity at risk.  This harm burdens and interferes with the ability of transgender persons to live in a manner consistent with their gender identity in all aspects of life, including where doing so is medically necessary.

176.   North Carolina's Surgical Requirement violates the fundamental right to privacy of transgender persons, including Plaintiffs, who have not undergone "sex reassignment surgery," by causing disclosure of their transgender status and by depriving them of significant control over the circumstances around such disclosure.

177.   There are no adequate safeguards to prevent the harm caused by the involuntary disclosure of one's transgender status.  For example, a person may need to disclose their birth certificate directly to third parties, without any of the privacy safeguards that may exist where the government discloses information to third parties.

*Decisional Privacy, Liberty, and Autonomy*

178.   The substantive protections of the Due Process Clause also protect the right of every person to the possession and control of their own person, and to define and express their identity.  These protections extend to personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity.

179.   The fundamental protections of an individual's autonomy encompass the right to define and express one's gender identity, including a right not to be treated in a manner contrary to one's sex, as defined by one's gender identity, by the government.  The

45

right to define and express one's gender identity is indeed among the most intimate imaginable, relating to matters that individuals are uniquely positioned to understand and define for themselves.

180.    The Fourteenth Amendment's Due Process Clause also protects individuals' substantive rights to be free to make certain private decisions without unjustified governmental intrusion.

181.    The right to make certain private decisions without unjustified governmental intrusion includes the right to refuse unwanted medical treatment.

*Bodily Integrity and Medical Autonomy*

182.    The substantive protections of the Due Process Clause safeguard the right of every person to bodily integrity.  Encompassed in that right is the right to choose whether to undergo a particular medical treatment.

183.    North Carolina law interferes with this fundamental constitutional right by imposing a surgical requirement on transgender people to correct their birth certificate. Decisions regarding medical treatment should be made based on the advice of medical and mental health professionals, and consistent with the prevailing standards of care.  However, the importance of the birth certificate as an identity document impermissibly pressures transgender people into undergoing surgeries that may be medically unnecessary or otherwise unwanted simply to correct their birth certificates.

184.   Denying transgender people the ability to correct their birth certificate because they do not undergo surgery infringes on their right to choose whether to undergo a particular medical treatment.

\*      \*      \*

185.   North Carolina's Surgical Requirement and Defendants' practices force transgender people who live in North Carolina either to undergo "sex reassignment surgery" to secure a correct birth certificate or endanger their health and safety with an incorrect birth certificate.

186.   When the government identifies individuals by their sex in official documents, the constitutional protections that shelter individual and bodily autonomy, dignity, and personhood prohibit the government from unwarranted interference with the right to live in accordance with one's gender identity.

187.   By enforcing North Carolina's Surgical Requirement, Defendants deny recognition of a transgender person's sex absent proof of "sex reassignment surgery" and necessarily impose significant harms on that person.   The government's refusal to recognize a person's sex not only denies a transgender person equal dignity and respect by undermining, indeed denying, their very identity and existence, but also authorizes and invites other public and private entities to similarly discriminate and deny recognition.

188.   By enforcing North Carolina's Surgical Requirement, Defendants unconstitutionally interfere with the fundamental right to autonomy in one's person and

identity to which all transgender persons born in North Carolina, including Plaintiffs, are entitled.

189. The Surgical Requirement and Defendants' practices are neither narrowly tailored nor the least restrictive alternative to further a compelling government interest and therefore violate the liberty interests of Plaintiffs.

190. Indeed, there is no compelling, important, or even legitimate interest in the government causing transgender persons who have not undergone "sex reassignment surgery" to involuntarily disclose their transgender status to third parties every time they present their birth certificate to such persons. Furthermore, there is no compelling, important, or even legitimate interest, in the government interfering with the right of transgender persons to autonomy in one's person and identity. Nor is there a compelling, important, or even legitimate interest in the government interfering with a transgender person's decision to undergo or not undergo a medical procedure.

191. Accordingly, Defendants are liable for their violations of Plaintiffs' Fourteenth Amendment Due Process rights under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring North Carolina's Surgical Requirement unconstitutional and enjoining its enforcement.

### COUNT III – ABRIDGEMENT OF FREE SPEECH IN VIOLATION OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

192. Plaintiffs hereby incorporate by reference and reallege paragraphs 1 thru 153 of this Complaint as though fully set forth herein.

193. The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983 and applicable to the states through the Fourteenth Amendment, provides that a state "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

194. The freedom of speech protected by the First Amendment is multifaceted. The First Amendment protects both the right to speak and the right to refrain from speaking. A claim of compelled speech requires speech to which the speaker objects that is compelled by some governmental action.

195. The Surgical Requirement violates the First Amendment rights of transgender people who have not undergone "sex reassignment surgery," including Plaintiffs, to refrain from speaking by forcing them to identify with a sex that was incorrectly assigned to them at birth and conflicts with who they are. It also prevents transgender people who have not undergone "sex reassignment surgery" from accurately expressing their gender identity.

196. The Surgical Requirement also forces transgender people who have not undergone "sex reassignment surgery" to disclose their transgender status, thereby compelling them to disclose private, sensitive, and personal information that they may not want to be publicly known or that may expose them to discrimination, harassment, and violence.

197. The Surgical Requirement further violates the First Amendment rights of transgender people who have not undergone "sex reassignment surgery," including

49

Plaintiffs, to refrain from speaking, compelling them instead to endorse the government's position as to their own gender, as well as on the meaning of sex generally, through the birth certificate they must show to others. The sex designation listed on Plaintiffs' birth certificates conveys the state's message that sex is determined solely by the appearance of external genitalia at the time of birth and never deviates from that—a message that is inconsistent with the medical and scientific understanding of sex and to which each Plaintiff strongly objects.

198. The Surgical Requirement violates the First Amendment right of transgender people who have not undergone "sex reassignment surgery," including Plaintiffs, to speak by preventing them from accurately expressing their gender.

199. The Surgical Requirement is not narrowly tailored to serve any compelling governmental interest.

200. Accordingly, Defendants are liable for violating the First Amendment rights of the Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring North Carolina's Surgical Requirement unconstitutional and enjoining its enforcement.

### COUNT IV – VAGUENESS
### IN VIOLATION OF THE FOURTEENTH AMENDMENT
### OF THE UNITED STATES CONSTITUTION

201. Plaintiffs hereby incorporate by reference and reallege paragraphs 1 thru 153 of this Complaint as though fully set forth herein.

202.   It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.

203.   A statute can be impermissibly vague for either of two independent reasons: (a) if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, and (b) if it authorizes or even encourages arbitrary and discriminatory enforcement.

204.   North Carolina's Surgical Requirement, as codified in N.C. Gen. Stat. § 130A-118(b)(4), violates the Due Process Clause of the Fourteenth Amendment because it authorizes and encourages arbitrary and discriminatory enforcement.  The statute does not define "sex reassignment surgery."  Additionally, the statute does not provide explicit standards for its enforcement and, instead, impermissibly delegates to individual clerks reviewing applications to correct the sex designation on birth certificates the authority to determine what type(s) of medical treatment constitute "sex reassignment surgery."

205.   Because North Carolina's Surgical Requirement delegates this authority to individual clerks, the requirement is enforced on an ad hoc, subjective, and therefore, inconsistent, basis.  This results in an arbitrary and discriminatory application of the statute.

206.   As described above, North Carolina's Surgical Requirement interferes with Plaintiffs' Rights to Equal Protection and Due Process afforded by the Fourteenth Amendment and Right to Free Speech afforded by the First Amendment.  Thus, the arbitrary and discriminatory application of N.C. Gen. Stat. § 130A-118(b)(4) impairs the exercise of Plaintiffs' fundamental constitutional rights.

51

207. Because the Surgical Requirement does not define what type of surgery is required or identify who determines what type of surgery is sufficient, even if Plaintiffs had the means, ability, or desire to obtain gender-affirming surgery at this time, Plaintiffs are unable to comply with the Surgical Requirement.

208. Accordingly, Defendants are liable for their violations of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring North Carolina's Surgical Requirement unconstitutional and enjoining its enforcement.

## LACK OF LEGAL REMEDY

209. Plaintiffs' harm is ongoing and cannot be alleviated except by injunctive relief.

210. No other remedy is available at law.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request that the Court enter Judgment in their favor and against Defendants on all claims as follows:

      a.     Enter a declaratory judgment that the actions of Defendants complained of herein, including the enforcement of North Carolina's Surgical Requirement, are in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and the Free Speech Clause of the First Amendment to the United States Constitution;

      b.     Permanently enjoin Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, from enforcing North Carolina's Surgical Requirement or from requiring any particular form of medical intervention in order for transgender people to obtain birth certificates that accurately reflect their sex, consistent with their gender identity;

      c.     Order Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, to permit transgender persons born in North Carolina to correct their birth certificates to accurately reflect their sex, consistent with their gender identity, without adhering to the practice delineated in N.C. Gen. Stat. § 130A-118(b)(4) of requiring an individual to submit proof that they have undergone "sex reassignment

surgery" or any other form of medical intervention before a corrected birth certificate will be issued, and without otherwise disclosing a person's transgender status.

      d.    Order Defendants to immediately issue corrected birth certificates to Plaintiffs Lillith Campos, C.B., and M.D. accurately reflecting their sex, consistent with their gender identity.

      e.    Award Plaintiffs the costs and disbursements of this action, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

      f.    Grant such other and further relief in favor of Plaintiffs as this Court deems just, equitable, and proper.

*[Signature Page Follows]*

54

Dated: November 16, 2021

Respectfully submitted,

/s/ Omar Gonzalez-Pagan
Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
Phone: (212) 809-8585
Facsimile: (212) 809-0055
ogonzalez-pagan@lambdalegal.org

Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
1 West Court Square, Suite 105
Decatur, GA 30030
Phone: (404) 897-1880
Facsimile: (404) 506-9320
ccharles@lambdalegal.org

Avatara Smith-Carrington*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219-6722
Phone: (214) 219-8585
Facsimile: (214) 219-4455
asmithcarrington@lambdalegal.org

*Appearing by special appearance
pursuant to L.R. 83.1(d).

/s/ Sarah M. Saint
Sarah M. Saint (N.C. Bar No. 52586)
Eric M. David (N.C. Bar No. 38118)
BROOKS PIERCE MCLENDON
    HUMPHREY & LEONARD, LLP
P.O. Box 26000
Greensboro, NC 27420
Phone: (336) 271-3197
Facsimile: (336) 232-9197
ssaint@brookspierce.com
edavid@brookspierce.com

Derek R. McDonald*
Maddy R. Dwertman*
Puneet Kohli*
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
Phone: (512) 322-2500
Facsimile: (512) 322-2501
derek.mcdonald@bakerbotts.com
maddy.dwertman@bakerbotts.com
puneet.kohli@bakerbotts.com

Brandt Thomas Roessler*
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112-4498
Phone (212) 408-2500
Facsimile: (212) 408-2501
brandt.roessler@bakerbotts.com

*Counsel for Plaintiffs*